[995 NE2d 148, 972 NYS2d 186]

Kevin Kowalski, Appellant, v St. Francis Hospital and Health Centers et al., Respondents, et al., Defendants.

Argued May 28, 2013; decided June 26, 2013

**POINTS OF COUNSEL**

*Bleakley Platt & Schmidt*, White Plains (*Susan E. Galvão, John P. Hannigan, Vincent W. Crowe* and *Robert D. Meade* of counsel), for appellant. I. The medical defendants had a common-law duty to safeguard and protect appellant, measured in part by reference to his capacity to provide for his own safety. (*Tagle v Jakob*, 97 NY2d 165; *Di Ponzio v Riordan*, 89 NY2d 578; *N.X. v Cabrini Med. Ctr.*, 97 NY2d 247; *Santos v Unity Hosp.*, 301 NY 153; *Zophy v State of New York*, 27 AD2d 414, 22 NY2d 921; *White v Sheehan Mem. Hosp.*, 119 AD2d 989; *Horton v Niagara Falls Mem. Med. Ctr.*, 51 AD2d 152; *Freeman v St. Clare's Hosp. & Health Ctr.*, 156 AD2d 300; *Sanchez v State of New York*, 99 NY2d 247; *Parvi v City of Kingston*, 41 NY2d 553.) II. The Appellate Division order carves out an impermissible exception to the common-law duty of care owed by health care providers to the patients within their care. III. The cases cited by the Appellate Division only exacerbate the error and deepen the confusion regarding the proper standard of care. (*Lawlor v Lenox Hill Hosp.*, 74 AD3d 695, 15 NY3d 713; *Matter of Michael S.*, 166 Misc 2d 875; *Mottau v State of New York*, 174 Misc 2d 884.) IV. The Appellate Division erred in deciding this case as a matter of law, rather than allowing a jury to consider the reasonableness of the medical defendants' acts and omissions on the date in question. (*Parvi v City of Kingston*, 41 NY2d 553; *Santos v Unity Hosp.*, 301 NY 153; *N.X. v Cabrini Med. Ctr.*, 97 NY2d 247; *Herrera v Lever*, 35 Misc 3d 1209; *Sanchez v State of New York*, 99 NY2d 247; *Haber v Cross County Hosp.*, 37 NY2d 888; *Juseinoski v New York Hosp. Med. Ctr. of Queens*, 18 AD3d 713; *Kadyszewski v Ellis Hosp. Assn.*,

192 AD2d 765; *Pedraza v Wyckoff Hgts. Med. Ctr.*, 191 Misc 2d 659.)

*The Law Offices of Steinberg, Symer & Platt, LLP*, Poughkeepsie (*Robert R. Haskins* of counsel), for St. Francis Hospital and Health Centers, respondent. I. The medical defendants did not breach any duty in determining it was appropriate to discharge appellant. (*N.X. v Cabrini Med. Ctr.*, 97 NY2d 247; *Freeman v St. Clare's Hosp. & Health Ctr.*, 156 AD2d 300; *Zophy v State of New York*, 27 AD2d 414, 22 NY2d 921; *Warner v State of New York*, 297 NY 395; *Parvi v City of Kingston*, 41 NY2d 553; *Walsh v Town of Cheektowaga*, 237 AD2d 947; *Maldonado v County of Suffolk*, 10 AD3d 387; *Fagan v Atlantic Coast Line R.R. Co.*, 220 NY 301; *Haber v Cross County Hosp.*, 37 NY2d 888; *Juseinoski v New York Hosp. Med. Ctr. of Queens*, 18 AD3d 713.) II. Appellant did not put forth sufficient evidentiary proof at the trial court level to defeat the prima facie showing of entitlement to summary judgment. (*Zuckerman v City of New York*, 49 NY2d 557; *Romano v Stanley*, 90 NY2d 444; *Kornfeld v NRX Tech.*, 93 AD2d 772; *Alvarez v Prospect Hosp.*, 68 NY2d 320.)

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP*, New York City (*Robert A. Spolzino, Judy C. Selmeci, Marshal S. Endick* and *Jeffrey B. Araten*), of counsel for Chandra Chintapalli, M.D., respondent. I. Dr. Chintapalli had no authority under the Mental Hygiene Law to detain plaintiff since plaintiff came to the hospital voluntarily. (*Lawlor v Lenox Hill Hosp.*, 74 AD3d 695, 15 NY3d 713; *Matter of Bates v Lang*, 26 AD2d 462; *Randall v Bailey*, 288 NY 280; *Matter of Prime*, 136 NY 347; *Moore v Mausert*, 49 NY 332; *Matter of Kesselbrenner v Anonymous*, 33 NY2d 161; *People ex rel. Pilgrim v Quick*, 34 AD2d 562; *Matter of James*, 22 NY2d 545; *People ex rel. Ordway v St. Saviour's Sanitarium*, 34 App Div 363; *Matter of K.L.*, 1 NY3d 362.) II. A physician has no common-law duty or authority to detain an intoxicated person involuntarily. (*Haymon v Pettit*, 9 NY3d 324; *Lauer v City of New York*, 95 NY2d 95; *Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d 579; *Darby v Compagnie Natl. Air France*, 96 NY2d 343; *Galindo v Town of Clarkstown*, 2 NY3d 633; *D'Amico v Christie*, 71 NY2d 76; *Martino v Stolzman*, 18 NY3d 905; *Purdy v Public Adm'r of County of Westchester*, 72 NY2d 1; *Engelhart v County of Orange*, 16 AD3d 369; *Cartier v Long Is. Coll. Hosp.*, 111 AD2d 894.) III. Dr. Chintapalli had no duty to plaintiff because plaintiff had terminated the physician-patient relationship. (*Garofalo v State of New York*, 17 AD3d 1109, 5 NY3d 707; *Zimmerly v Good Samaritan Hosp.*, 261

AD2d 614; *Lee v City of New York*, 162 AD2d 34; *Blythe v City of New York*, 119 AD2d 615; *Heller v Peekskill Community Hosp.*, 198 AD2d 265; *Marabello v City of New York*, 99 AD2d 133; *N.X. v Cabrini Med. Ctr.*, 97 NY2d 247; *Santos v Unity Hosp.*, 301 NY 153; *Freeman v St. Clare's Hosp. & Health Ctr.*, 156 AD2d 300.) IV. Dr. Chintapalli's decision not to detain plaintiff was an exercise of professional judgment for which he cannot be liable, even if his judgment was inconsistent with hospital protocols. (*Weinreb v Rice*, 266 AD2d 454; *Fiederlein v City of New York Health & Hosps. Corp.*, 80 AD2d 821; *Schrempf v State of New York*, 66 NY2d 289; *Darren v Safier*, 207 AD2d 473; *Topel v Long Is. Jewish Med. Ctr.*, 55 NY2d 682; *Davis v Patel*, 287 AD2d 479; *Conrad v County of Westchester*, 259 AD2d 724; *Brown v Metropolitan Tr. Auth.*, 281 AD2d 159.)

*Phelan, Phelan & Danek, LLP*, Albany (*Timothy S. Brennan* of counsel), for Emergency Physician Services of New York, P.C., respondent. I. Plaintiff knowingly refused medical treatment and could not have been detained under New York's statutory and constitutional provisions. (*Matter of Delio v Westchester County Med. Ctr.*, 129 AD2d 1; *Schloendorff v Society of N.Y. Hosp.*, 211 NY 125; *Matter of Boggs v New York City Health & Hosps. Corp.*, 132 AD2d 340; *Humphrey v Cady*, 405 US 504; *Addington v Texas*, 441 US 418; *Schrempf v State of New York*, 66 NY2d 289; *Pingtella v Jones*, 305 AD2d 38; *Engelhart v County of Orange*, 16 AD3d 369.) II. Plaintiff failed to demonstrate the existence of a material issue of fact requiring jury resolution. (*Alvarez v Prospect Hosp.*, 68 NY2d 320; *Zuckerman v City of New York*, 49 NY2d 557; *Matter of Delio v Westchester County Med. Ctr.*, 129 AD2d 1; *Schloendorff v Society of N.Y. Hosp.*, 211 NY 125; *Warner v State of New York*, 297 NY 395; *Siegel v City of New York*, 43 AD2d 271; *N.X. v Cabrini Med. Ctr.*, 97 NY2d 247; *Santos v Unity Hosp.*, 301 NY 153; *Zophy v State of New York*, 27 AD2d 414; *White v Sheehan Mem. Hosp.*, 119 AD2d 989.) III. To the extent that plaintiff's experts disagreed, their opinions, at best, established a difference in medical judgment that was insufficient to oppose the motion for summary judgment. (*Fiederlein v City of New York Health & Hosps. Corp.*, 80 AD2d 821; *Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270.)

### OPINION OF THE COURT

Smith, J.

We hold that, on the facts of this case, a hospital and an emergency room doctor did not owe an intoxicated patient a duty to prevent him from leaving the hospital.

## I

Plaintiff was brought by a friend to the emergency room of defendant St. Francis Hospital and Health Centers, seeking admission to St. Francis's detoxification facility, known as "Turning Point." This was at least plaintiff's second visit to St. Francis; he had been admitted there in the previous month with suicidal thoughts and had been placed on a "one-to-one watch." On that occasion, he improved after receiving medication and was discharged. Apparently, no one at the hospital consulted the record of plaintiff's previous visit when he returned.

There is no evidence that plaintiff was suicidal on his later visit to St. Francis. But he showed signs of severe intoxication, including red eyes, garbled speech and a strong smell of alcohol. His blood-alcohol content was extremely high: .369%. He was, however, alert and able to walk. He was seen by an emergency room doctor, defendant Chandra Chintapalli, and was accepted to the Turning Point program.

About four hours after his arrival, plaintiff was waiting to be transported to Turning Point when he removed an IV from his arm and told a nurse he planned to go home in a taxi. She urged him to call a friend to pick him up, and he agreed. The nurse went to tell Dr. Chintapalli that plaintiff wanted to leave; when she returned, plaintiff was gone. The nurse asked Dr. Chintapalli if she should call the police. The doctor said no, but notified hospital security. Plaintiff left unescorted, and was hit by a car an hour or two later.

Plaintiff sued the hospital, Dr. Chintapalli and the doctor's professional corporation (defendants in this opinion) for negligence and medical malpractice. Supreme Court denied defendants' motions for summary judgment. The Appellate Division reversed and granted the motions, holding that defendants had shown prima facie "that they lacked authority to confine the plaintiff upon his departure from St. Francis" and that plaintiff had failed to contradict that showing (*Kowalski v St. Francis Hosp. & Health Ctrs.*, 95 AD3d 834, 835 [2d Dept 2012]). We granted leave to appeal (19 NY3d 809 [2012]) and now affirm.

## II

The gist of plaintiff's claim is that defendants should have prevented him from leaving the emergency room. We agree with

the Appellate Division that defendants had no right, and therefore could have had no duty, to do so.

There are surely few principles more basic than that the members of a free society may, with limited exceptions, come and go as they please. Of course there are people so mentally impaired that they must be denied this right, but that category is a narrow one and does not include everyone who would be safer in a detoxification facility than on the street. Thus the common law permitted the restraint of people whose mental state might make them a danger to themselves or others only in extreme circumstances. As Judge Fuld explained in *Warner v State of New York* (297 NY 395, 401 [1948]):

> "The common law recognized the power to restrain, summarily and without court process, an insane person who was dangerous at the moment. The power was to be exercised, however, only when necessary to prevent the party from doing some immediate injury either to himself or others and only when the urgency of the case demands immediate intervention. On the other hand, insane persons who were not dangerous were not liable to be thus arrested or restrained . . . *Emmerich v. Thorley* [(35 App Div 452 [1st Dept 1898])] . . . is a striking illustration of the sort of case wherein summary restraint is justifiable. There, the plaintiff who had been summarily and forcibly restrained was actually in the act of throwing herself out of a window to escape fancied pursuers" (internal quotation marks and citations omitted).

Today, Mental Hygiene Law § 22.09 specifically addresses the question of when a hospital may retain "a person whose mental or physical functioning is substantially impaired as a result of the presence of alcohol . . . in his or her body" (Mental Hygiene Law § 22.09 [a] [1]). The statute deals separately with the case of an intoxicated person "who comes voluntarily or is brought without his or her objection" to a hospital or other treatment facility (§ 22.09 [d]) and one "who is brought with his or her objection" (§ 22.09 [e]). In the latter case, the person "may be retained for emergency treatment" if he or she is examined by a doctor and found to be incapacitated to such a degree that "there is a likelihood to result in harm to the person or others" (§ 22.09 [e]); a "likelihood to result in harm" to oneself must be "manifested by threats of or attempts at suicide or serious

bodily harm or other conduct" that demonstrates a danger of self-injury (Mental Hygiene Law § 22.09 [a] [3]). For the former category—people who, like plaintiff, come to the hospital voluntarily—the Mental Hygiene Law makes no provision for involuntary retention.

Plaintiff concedes that he could not have been retained under Mental Hygiene Law § 22.09. He argues that the Mental Hygiene Law is not the only possible source of a right to confine an intoxicated person. We need not decide that question: Plaintiff cites no other statute, and there is no principle of common law, that would permit the restraint of a patient on the facts of this case. Plaintiff argues that a duty to restrain him flowed from the hospital's and the doctor's common-law duty of care, but there can be no duty to do that which the law forbids. To restrain plaintiff on these facts would have exposed defendants to liability for false imprisonment.

Plaintiff points to two specific features of this case which show, he says, that defendants were at fault: the failure to consult the record of plaintiff's previous hospitalization, when he was contemplating suicide, and Dr. Chintapalli's rejection of a nurse's suggestion to call the police. Neither fact changes the result. A patient cannot be confined simply because he was having suicidal thoughts a month ago. And the doctor had no duty to call the police; the police could not, on the facts known to Dr. Chintapalli when plaintiff left the hospital, have forced plaintiff to return.

The dissent advances two theories. First, it says that the Mental Hygiene Law is not "implicated" here (dissenting op at 487)—but Mental Hygiene Law § 22.09 (c), (d) and (e) apply on their face to a "general hospital." Secondly, the dissent argues, not that defendants could or should have prevented plaintiff from leaving the hospital, but that defendants failed "to follow their own protocols" in other ways (dissenting op at 487). Nothing in this record, however, supports an inference that there was any causal connection between any of the alleged departures from protocol that the dissent relies on and plaintiff's injury. This case is about whether defendants had a duty to prevent plaintiff from leaving the hospital, and nothing else.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

PIGOTT, J. (dissenting). I would reverse on two grounds: the first based upon the Appellate Division's erroneous holding that

the Mental Hygiene Law is implicated here, and the second based upon what I view as defendants' common-law duty to plaintiff.

With respect to the Appellate Division's analysis, it is clear that article 22 of the Mental Hygiene Law does not apply. Article 22, entitled "Chemical Dependence Programs, Treatment Facilities, and Services," is primarily addressed to an entirely different category of medical providers, not general hospitals, with a limited exception for emergency treatment (*see* Mental Hygiene Law § 22.09 [c], [d], [e]). The Appellate Division held that a person, "brought voluntarily to a medical facility for treatment of alcoholism[,] cannot be involuntarily confined solely for that treatment" (95 AD3d 834 [2d Dept 2012]). But article 22 does not, as the Appellate Division seems to imply, displace a medical provider's common-law duty relative to patients, incapacitated by alcohol or any other affliction, who voluntarily present themselves for emergency treatment. To hold otherwise distorts both article 22 and the common-law duty of health care providers.

Once the Mental Hygiene Law is removed from the equation, the issue then becomes: what is the common-law duty of defendants to a concededly intoxicated patient once he presents himself to the hospital and comes under the care of a physician? Defendants' argument in support of their motion for summary judgment is straightforward—plaintiff did not meet the legal standard for *involuntary* confinement, i.e., he was not an imminent danger to himself or others, and, because he was not such a danger, they owed him no duty. He was free to leave and there was nothing defendants could have done to legally stop him.

But this case has nothing to do with whether "free" individuals may "come and go as they please" (majority op at 485), and has everything to do with defendants' duty to a patient, like plaintiff, who presents to the emergency department in an intoxicated state. Because plaintiff submitted evidence through expert affidavits establishing that defendants failed to follow their own protocols in treating him, defendants' motion for summary judgment should have been denied.

Defendants supported their position with three experts, but the opinions of only two of them—a psychiatrist and an RN with a doctorate in the field of adult nursing practice—merit discussion here. The psychiatrist opined that the "undisputed facts demonstrate that [plaintiff] was not suicidal, and had not

manifested any signs of [being an] imminent [danger] to himself [and] others." The RN, who submitted an affidavit on behalf of St. Francis, claimed that there was nothing the nursing staff could have done to stop plaintiff because it had no authority to restrain plaintiff, particularly where he had not expressed any desire to harm anyone.

However, these opinions, drawn from the Mental Hygiene Law, are tangential to the basic question of the defendants' common-law duty to a patient such as this plaintiff, who presented with a fractured nose and in an inebriated state. Underscoring St. Francis's duty in this regard is the fact that, just one month prior to this admission, plaintiff presented to the same emergency department in an intoxicated and suicidal state. In response to that, St. Francis placed plaintiff on a "one-to-one watch," consistent with its written policy, until he was discharged to his family two days later. The majority acknowledges that St. Francis's staff in all likelihood failed to consult the medical records concerning plaintiff's recent visit (majority op at 484).

In opposition to the motion, plaintiff presented affidavits from his own experts—a board-certified emergency medicine physician and an expert in psychiatry and neurology. These medical experts found fault with plaintiff's care and treatment by defendants, beginning with St. Francis's failure to abide by its own policies for a patient, such as plaintiff, with a history of psychiatric hospitalization, suicidal ideations and heavy drinking, all of which indicated that one-to-one surveillance may be needed. They also opined that, based on plaintiff's behavior, defendant Chintapalli should have assigned a one-to-one watch. These experts explained that the decision by St. Francis and Chintapalli not to monitor plaintiff deviated from the standard of care and violated hospital protocol. Moreover, St. Francis failed to abide by its policy that "potentially unstable patients by history will not be left unattended while in the Emergency Department" (emphasis omitted), which is clearly what occurred here. These aforementioned failures were compounded by Chintapalli's instructions; when asked, after the patient had left against medical advice, whether the police should be called, he answered "no."

The majority's opinion implies that this is an "all or nothing" issue, namely, that because St. Francis had no authority to restrain plaintiff, it owed him no further duty. In my view, plaintiff, through his experts, raised a triable issue of fact with

respect to the defendants' common-law duty as outlined in the hospital's own protocols. Whether plaintiff would prevail at trial is another question; but serious issues of fact with respect to defendants' conduct remain, as do triable issues of fact concerning proximate cause. I would reverse the Appellate Division order, deny the defendants' motion for summary judgment and reinstate the complaint.

Chief Judge LIPPMAN and Judges GRAFFEO, READ and RIVERA concur with Judge SMITH; Judge PIGOTT dissents and votes to reverse in an opinion in which Judge ABDUS-SALAAM concurs.

Order affirmed, with costs.